IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Latrell L. Williams, | ) | C/A No.: 1:14-4266-DCN-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.     Relevant Background

        A.     Procedural History

On February 29, 2012, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on August 7, 2011. Tr. at 97, 99, 175–80, 181–88.

Her applications were denied initially and upon reconsideration. Tr. at 126–30, 134–35, 136–37. On June 12, 2013, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Edward T. Morriss. Tr. at 51–76 (Hr'g Tr.). The ALJ issued an unfavorable decision on July 18, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 35–50. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on November 1, 2014. [ECF No. 1].

B.      Plaintiff's Background and Medical History

1.      Background

Plaintiff was 39 years old at the time of the hearing. Tr. at 54. She completed an associate's degree. *Id.* Her past relevant work ("PRW") was as a customer service representative in a call center, a telemarketer, a purchasing agent, and a computer administrator. Tr. at 210, 220. She alleges she has been unable to work since August 7, 2011. Tr. at 175, 181.

2.      Medical History

a.      Evidence Prior to ALJ's Hearing

On August 8, 2011, Plaintiff presented to the emergency department at St. Francis Hospital complaining of an injury to her left knee. Tr. at 294. An examining nurse observed medial tenderness over Plaintiff's left anterior knee. Tr. at 295. X-rays were normal. Tr. at 301. Plaintiff received a Ketorolac injection and was fitted with crutches.

2

Tr. at 296. She was instructed to use an Ace bandage wrap, to rest and elevate her knee, and to apply ice. Tr. at 298. She was also prescribed Naproxen and advised to follow up with an orthopedist in three to five days. Tr. at 297.

Plaintiff reported left knee pain to to Tresha T. Ward, M.D. ("Dr. Ward"), on August 15, 2011. Tr. at 315. Dr. Ward observed Plaintiff's left knee to be very tender to palpation and to demonstrate visible swelling. *Id.* She prescribed Oxycodone. Tr. at 316.

On September 7, 2011, Plaintiff followed up with Dr. Ward and continued to complain of severe left knee pain. Tr. at 342. She reported she had been taking the pain medication more frequently than it was prescribed and that she was nearly out of medication. *Id.* She stated her pain was worsened by prolonged sitting and ambulation. *Id.* Dr. Ward observed Plaintiff to have decreased range of motion ("ROM") in her bilateral knee, worse on the left than on the right; a small effusion in her right knee; and marked tenderness to palpation of her medial ligaments. *Id.* She prescribed a Butrans patch and indicated Plaintiff's medical leave should be extended through September 23. *Id.* She also referred Plaintiff to physical therapy. Tr. at 343.

Plaintiff presented to Dr. Ward for a recheck on September 21, 2011, and reported persistent left knee pain. Tr. at 340. Plaintiff complained that her left knee pain was exacerbated by both prolonged sitting and ambulation. *Id.* Dr. Ward noted that Plaintiff appeared uncomfortable and ambulated with crutches. *Id.* She observed Plaintiff to be tender to palpation in both her knees and to have mild swelling and markedly decreased ROM in her left knee. *Id.* She prescribed Oxycodone and instructed Plaintiff to take it

every eight hours as needed. *Id.* She also advised Plaintiff to continue physical therapy. *Id.*

Plaintiff participated in physical therapy from September 14 to October 16, 2011, but she experienced no improvement in her symptoms. Tr. at 280–93.

Plaintiff presented to Erin Watrobski, PA-C ("Ms. Watrobski"), at Orthopaedic Specialists of Charleston on October 13, 2011. Tr. at 270. She reported that she had sustained a fall in her home on August 7, and injured her left knee. *Id.* Ms. Ward observed Plaintiff to have minimal left knee effusion, tenderness in the medial joint line and the medial rim of the plica, medial joint line pain with varus stress, and ROM from 120 degrees of flexion to a five-degree extension lag. *Id.* She recommended Plaintiff proceed with magnetic resonance imaging ("MRI") and follow up with Kenneth M. Caldwell, M.D. ("Dr. Caldwell"), following the MRI to discuss treatment options.

On October 19, 2011, an MRI of Plaintiff's left knee demonstrated a posterior horn medial meniscal tear and an incomplete tear of the medial collateral ligament ("MCL"). Tr. at 271.

Plaintiff followed up with Dr. Caldwell on October 20, 2011, to discuss the results of her recent MRI. Tr. at 269. Dr. Caldwell observed Plaintiff to have no appreciable effusion, but to have point tenderness along the medial joint line of her left knee and to experience significant discomfort with increased varus. *Id.* Dr. Caldwell indicated the MRI showed "a clear signal abnormality in the leading margin of the posterior horn of the medial meniscus that is compatible with meniscal tearing." *Id.* He recommended Plaintiff proceed with arthroscopic surgery. *Id.*

On October 21, 2011, Plaintiff followed up with Dr. Ward and reported that she had to return to work or she would be terminated. Tr. at 338. Dr. Ward noted that Plaintiff had stopped physical therapy and would be having surgery to repair her torn left meniscus. *Id.* She observed Plaintiff to have mild swelling and markedly decreased ROM of her left knee. *Id.* She refilled Plaintiff's prescription for Oxycodone and instructed her to follow up in four weeks. Tr. at 339.

Plaintiff presented to Dr. Ward on November 18, 2011, and reported worsened left knee pain and marked neck and back pain. Tr. at 336. She indicated to Dr. Ward that Dr. Caldwell had suggested her neck and back pain were caused by her asymmetrical use of her lower extremities. *Id.* She noted that Plaintiff "appears in pain" and observed Plaintiff to have decreased ROM and mild tenderness to palpation in her neck, paraspinal muscle spasms on her left and right, mild tenderness to palpation of her spine, and exquisite tenderness and swelling in her left knee. *Id.* She referred Plaintiff for x-rays of the cervical, thoracic, and lumbar areas of her spine. Tr. at 336–37.

On December 7, 2011, Plaintiff underwent x-rays. Tr. at 344–46. The x-ray of Plaintiff's thoracic spine indicated upper thoracic mild kyphosis and spondylosis. Tr. at 344. The x-ray of Plaintiff's cervical spine showed mild cervical kyphosis, possibly due to position or spasm and biapical pulmonary nodules. Tr. at 345. The x-ray of Plaintiff's lumbar spine indicated right sacroiliac sclerosis with a small subchondral cyst. Tr. at 346.

On December 8, 2011, Plaintiff followed up with Dr. Ward to discuss the x-ray findings. Tr. at 334. She continued to report pain in her left knee, neck, and back. *Id.* Dr. Ward indicated the x-rays showed significant arthritis. *Id.* She noted that Plaintiff

"appears in pain." *Id.* Dr. Ward observed Plaintiff to have decreased ROM of her cervical spine with mild tenderness to palpation, paraspinal muscle spasms on her left and right, mild tenderness to palpation of her spine, and swelling and tenderness in her left knee. *Id.* She referred Plaintiff to Southeastern Spine Institute[1] for an orthopaedic surgery consultation. Tr. at 335.

Dr. Caldwell performed arthroscopic anterior synovectomy of Plaintiff's left knee on December 14, 2011. Tr. at 272–74. Plaintiff had no tearing of the medial meniscus and no articular defects in the medial compartment, but had a somewhat thickened and fibrotic medial shelf plica. Tr. at 272.

Plaintiff followed up with Ms. Watrobski on December 20, 2011, and reported that her discomfort was improving and that she was ambulating with a single crutch. Tr. at 308. Ms. Watrobski noted mild left knee effusion, but indicated Plaintiff's incisions were healing well, without signs of infection. *Id.* Plaintiff participated in rehabilitative physical therapy at Ms. Watrobski's direction. Tr. at 276–77, 308.

Plaintiff followed up with Dr. Ward on January 5, 2012, and reported increased left knee pain since beginning physical therapy. Tr. at 332. Plaintiff also complained of back, neck, and shoulder pain; joint stiffness; and muscle and joint aches. *Id.* Dr. Ward noted that Plaintiff had no increased swelling, erythema, or redness of the knee and that

---

[1] Although Dr. Ward's treatment notes reflect referrals to Southeastern Spine and the efforts of the physicians at Southeastern Spine to obtain an MRI of Plaintiff's lumbar spine, the administrative record inexplicably contains no medical evidence from Southeastern Spine. *See* Tr. at 335, 349, 351, 364, 380.

her incisions had healed well. *Id.* She prescribed Oxycodone and instructed Plaintiff to take it every four hours, as needed. *Id.*

On January 26, 2012, Plaintiff again reported worsened left knee pain. Tr. at 330. Dr. Ward noted that Plaintiff "appears in pain." Tr. at 330. She observed Plaintiff to have paraspinal muscle spasms on the left and right, to be mildly tender to palpation in her spine, and to have a swollen and tender left knee in the medial patellar area. *Id.* Dr. Ward refilled Plaintiff's prescription for Oxycodone and instructed her to follow up in four weeks. Tr. at 330–31.

On January 31, 2012, Plaintiff reported to Dr. Caldwell that her symptoms had improved. Tr. at 309. Dr. Caldwell encouraged Plaintiff to continue her strength training regimen and to follow up in eight weeks. *Id.*

On February 29, 2012, Plaintiff presented to Dr. Ward with low back spasms. Tr. at 328. She indicated that her physical therapy sessions had been decreased from three to two times per week because of severe left knee pain. *Id.* Dr. Ward indicated Plaintiff had no numbness or weakness in her lower extremities. *Id.* She noted Plaintiff "appears in pain." *Id.* She observed Plaintiff to have paraspinal muscle spasms on the right and left, to be mildly tender to palpation in her spine, and to be extremely tender to palpation in her right sacroiliac joint. *Id.* She noted Plaintiff's left knee remained mildly swollen and was very tender to palpation of the medial patellar area, but had no increased warmth or erythema. *Id.* Dr. Ward referred Plaintiff to a chiropractor and prescribed Zanaflex for back pain and Oxycodone for sacroiliitis. Tr. at 328–29.

Plaintiff complained to Dr. Ward of left knee pain and right sacroiliac joint pain on March 28, 2012. Tr. at 326. Dr. Ward noted that Zanaflex had not helped Plaintiff's severe muscle spasms and indicated Plaintiff "remains unable to work." *Id.* She observed Plaintiff to have paraspinal muscle spasms on the right and left, to be mildly tender to palpation in her spine, and to be extremely tender to palpation in her sacroiliac joint. *Id.* She noted Plaintiff's left knee was mildly swollen, but was less tender to palpation and demonstrated no increased warmth or erythema. *Id.*

On April 27, 2012, state agency medical consultant Mary Lang, M.D., reviewed the record and assessed Plaintiff to have the following physical residual functional capacity ("RFC"): occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; frequently operate foot controls with the left lower extremity; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; and avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and heights. Tr. at 82–84. State agency medical consultant William Cain, M.D., assessed identical limitations on July 12, 2012. Tr. at 106–08.

Plaintiff followed up with Dr. Ward on April 26, 2012, and endorsed some improvement in her left knee pain since reducing her physical therapy to twice a week. Tr. at 353. She complained of a new onset of intermittent numbness in her right great toe and continued to report severe pain in her right low back. *Id.* She indicated she had leaned over on several occasions and experienced a sudden onset of severe pain that

prevented her from getting up without her husband's assistance. *Id.* Plaintiff stated her muscle spasms were not relieved by Zanaflex. *Id.* She indicated that her illness, pain, limitations on activities, and resultant financial stress were causing depressive symptoms that included anhedonia, irritability, crying spells, and insomnia. *Id.* Dr. Ward noted that Plaintiff appeared in pain, had paraspinal muscle spasms on her left and right, was mildly tender to palpation of her spine, was extremely tender to palpation in her right sacroiliac joint, was mildly tender to palpation in her left knee, and had decreased sensation to light touch in her right great toe. *Id.* She refilled Plaintiff's prescriptions for Oxycodone and Robaxin for pain, prescribed Citalopram for depression, and referred Plaintiff for an MRI of her lumbar spine. Tr. at 354.

On May 25, 2012, Plaintiff reported to Dr. Ward that her left knee was feeling much better. Tr. at 351. She complained of severe right low back pain and left neck pain. *Id.* She indicated that Southeastern Spine was in the process of obtaining authorization for an MRI. *Id.* Plaintiff continued to report intermittent numbness in her right great toe. *Id.* She endorsed some symptoms of depression, but stated her symptoms had improved significantly on Citalopram. *Id.* Dr. Ward observed Plaintiff to have left and right paraspinal muscle spasms, to be mildly tender to palpation of her spine, to be extremely tender to palpation of her right sacroiliac joint, to have minimal tenderness to palpation of her left knee, and to have decreased sensation to light touch in her right great toe. *Id.*

Plaintiff presented to Dr. Ward on June 22, 2012, and complained of pain in her right low back and left neck and painful swelling in the soft tissue of her lateral left leg. Tr. at 349. She reported that her left knee was feeling much better. *Id.* However, she

endorsed intermittent numbness in her right great toe. *Id.* Dr. Ward indicated Southeastern Spine had been unable to obtain approval for an MRI of Plaintiff's spine. *Id.* She noted that Plaintiff had a large uterine fibroid, and that it was unclear how much it was contributing to her discomfort. *Id.* She indicated Plaintiff endorsed symptoms of depression, but that her symptoms were markedly reduced with the addition of Citalopram. *Id.* Dr. Ward observed Plaintiff to have paraspinal muscle spasms on her left and right, mild tenderness to palpation of the spine, extreme tenderness to palpation of the right sacroiliac joint, minimal tenderness to palpation of the left knee, warmness and swelling of the lateral left leg, and decreased sensation to light touch in the right great toe. Tr. at 349–50. Dr. Ward indicated Plaintiff's leg pain may be superficial phlebitis or thrombosis and that she would await an x-ray report and decision from Dr. Caldwell[2] regarding a diagnosis and treatment. Tr. at 350.

On July 17, 2012, Plaintiff saw Richard Ulmer, M.D. ("Dr. Ulmer"), in Dr. Ward's absence. Tr. at 382. She reported that she continued to experience left leg pain, and Dr. Ulmer observed tenderness in the anterior tibial compartment of Plaintiff's left leg. *Id.* He noted some swelling, superficial heat, and a cord of superficial phlebitis anteriorly. *Id.* He stated that the etiology of Plaintiff's lower leg pain was unclear and that he was uncertain why Plaintiff continued to need Oxycodone at its present dose. *Id.* He prescribed Salsalate and decreased Plaintiff's Oxycodone dosage to every six hours as opposed to every four hours. *Id.*

---

[2] Dr. Ward's records suggest that Plaintiff continued to see Dr. Caldwell after January 2012, but the administrative record inexplicably contains no treatment records from Dr. Caldwell after January 31, 2012. *See* Tr. at 309; *see also* Tr. at 350, 368, 372.

10

Plaintiff again reported left knee pain to Dr. Ward on August 1, 2012. Tr. at 380. She indicated she had experienced swelling in the soft tissue of her left lateral leg, just below her knee. *Id.* Dr. Ward observed a nodular feeling in the tissue below Plaintiff's left knee that was very tender to palpation. *Id.* She indicated Plaintiff had tried Salsalate at Dr. Ulmer's direction, but that it had not helped her pain. *Id.* She again prescribed Oxycodone to be taken every four hours. Tr. at 381.

State agency consultant Judith Von, Ph. D., completed a psychiatric review technique on August 16, 2012, and assessed depression as a non-severe impairment. Tr. at 104–05.

On September 5, 2012, Plaintiff reported to Dr. Ward that she had been immobilized by pain the day before. Tr. at 377. She indicated her depressive symptoms were markedly reduced on Citalopram. *Id.* Dr. Ward observed Plaintiff to have bilateral paraspinal muscle spasms and to be tender to palpation in the muscles to the left of her lumbar spine and in the tissue below her knee. Tr. at 377–78. She refilled Plaintiff's prescription for Oxycodone, referred her for lab work, and administered a Toradol injection in Plaintiff's right gluteus. Tr. at 378.

Plaintiff followed up with Dr. Ward on October 4, 2012. Tr. at 374. She indicated that Citalopram had helped her depressive symptoms, but that she continued to experience anhedonia, irritability, crying spells, and insomnia. *Id.* She stated that physical therapy, muscle relaxers, and non-steroidal anti-inflammatory drugs ("NSAIDS") had not reduced her pain. *Id.* Dr. Ward observed Plaintiff to have bilateral paraspinal muscle spasms and tenderness to palpation in the left side of her lumbar spine. *Id.* She also noted

a nodular feeling in the tissue below Plaintiff's left knee that was tender to palpation. Tr. at 375. She discontinued Plaintiff's prescription for Citalopram and prescribed Cymbalta. *Id.* She indicated she would refer Plaintiff to a pain management physician for injections after Plaintiff obtained an MRI. *Id.*

On November 2, 2012, Dr. Ward indicated that Dr. Caldwell was following Plaintiff for back and leg pain and had obtained approval for Plaintiff to undergo an MRI at the end of the month. Tr. at 372. Plaintiff complained that her low back and neck pain had increased as a result of the colder weather, but that her depressive symptoms had improved since she started taking Cymbalta. *Id.* Dr. Ward indicated she had a 20-minute conversation with Plaintiff regarding her depression and coping with chronic pain. *Id.*

Plaintiff followed up with Dr. Ward regarding back and leg pain on December 5, 2012. Tr. at 370. She continued to endorse right low back pain and left neck pain. *Id.* She also endorsed symptoms of depression and requested that her dosage of Cymbalta be increased. *Id.* On examination, Dr. Ward observed Plaintiff to have bilateral paraspinal muscle spasms. *Id.* She increased Plaintiff's Cymbalta dosage from 60 to 90 milligrams, refilled her prescription for Oxycodone, and referred her to Timothy Zgleszewski, M.D.,[3] a physical medicine and rehabilitation specialist, for back, leg, and knee pain. Tr. at 371.

On January 3, 2013, Plaintiff presented to Dr. Ward to follow up on knee, leg, and back pain. Tr. at 368. Dr. Ward indicated Dr. Caldwell had obtained approval for Plaintiff to undergo an MRI, which was scheduled for late-January. *Id.* Plaintiff indicated the pain in her right low back and left neck had increased because of the colder weather. *Id.* Dr.

---

[3] The administrative record contains no treatment notes from Dr. Zgelszewski.

Ward noted that Plaintiff's depressive symptoms had improved since her medication was switched from Citalopram to Cymbalta. *Id.* Plaintiff indicated she had been seeing a chiropractor following a motor vehicle accident, but that she had obtained no relief as a result of the treatment. *Id.* Dr. Ward observed Plaintiff to have bilateral paraspinal muscle spasms and crepitus knees. *Id.* She refilled Plaintiff's prescription for Oxycodone and instructed her to follow up in four weeks. Tr. at 369.

Plaintiff followed up with Dr. Ward for chronic back and leg pain on February 1, 2013. Tr. at 365. Dr. Ward indicated Plaintiff had to complete three more weeks of treatment with a chiropractor and acupuncturist before she could be examined by a spine specialist. *Id.* Dr. Ward observed Plaintiff to have bilateral paraspinal muscle spasms, but noted no additional abnormalities on examination. Tr. at 366. She refilled Plaintiff's medications and instructed her to follow up in four weeks. *Id.*

On March 1, 2013, Plaintiff indicated to Dr. Ward that she had completed chiropractic treatment with little improvement in her back and leg pain and requested a referral to Southeastern Spine Institute. Tr. at 363. Plaintiff reported numbness in the tip of her left great toe, as well as discoloration and thickening of the nail. *Id.* Dr. Ward noted that Plaintiff's depressive symptoms were stable on Cymbalta. *Id.* She observed Plaintiff to have bilateral paraspinal muscle spasms, knee crepitus, and decreased sensation to light touch in her left great toe. *Id.* She refilled Plaintiff's medications and referred her to Southeastern Spine Institute. Tr. at 364.

Plaintiff followed up with Dr. Ward regarding back and leg pain on April 1, 2013. Tr. at 361. Plaintiff reported little relief from acupuncture and chiropractic care, but

13

stated that Oxycodone provided some pain relief. *Id.* She complained of numbness in the tip of her left great toe, as well as some thickening and discoloration of the nail. *Id.* She described severe spasms in her right low back that had persisted since she attempted to pick up an item four days earlier. *Id.* She stated she experienced similar symptoms several times per month. *Id.* Plaintiff reported to Dr. Ward that her pain and spasms limited her ability to participate in family functions. *Id.* Dr. Ward observed Plaintiff to have bilateral paraspinal muscle spasms, knee crepitus, and decreased sensation to light touch in the tip of her left great toe, with a thickened and discolored nail. Tr. at 361–62.

On May 1, 2013, Dr. Ward complete a treating physician's statement in which she indicated Plaintiff was limited as follows: lifting and/or carrying five pounds occasionally and one pound frequently; continuously sitting for an hour or less and for six hours in an eight-hour workday; standing or walking for an hour or less during an eight-hour workday; never pushing and pulling, climbing stairs or ladders, balancing, bending, or stooping; rarely reaching; occasionally grasping, twisting, and handling, operating motor vehicles, and working with or around dangerous machinery; and frequently performing fine manipulation. Tr. at 355. She estimated Plaintiff would likely be absent from work more than four days per month. *Id.* She indicated the basis for her restrictions was Plaintiff's chronic back and leg pain. *Id.*

b.     Evidence Submitted to Appeals Council

An MRI of Plaintiff's lumbar spine on September 4, 2013, indicated right paracentral disc herniation at L5-S1 with subjacent curvilinear low T1 signal, consistent with subjacent hemorrhage. Tr. at 22. The herniation resulted in posterior displacement of

the descending right S1 nerve root and mild-to-moderate canal stenosis with mild bilateral foraminal narrowing. Tr. at 22–23. It also showed a calcified mass in Plaintiff's uterus that likely represented a fibroid. Tr. at 23.

Plaintiff presented to orthopaedic surgeon James K. Aymond, M.D. ("Dr. Aymond"), for a new patient consultation on October 1, 2013. Tr. at 19–20. She reported a history of chronic lumbar pain and a two-to-three week history of right-sided sciatica. Tr. at 19. Dr. Aymond observed Plaintiff to walk with a slow, deliberate gait; to be tender to palpation in the midline lumbosacral junction and right sciatic notch; to have diminished sensory examination in the right S1 dermatome distribution; and to have positive bilateral straight-leg raise. Tr. at 20. He reviewed Plaintiff's MRI findings, diagnosed displacement of lumbar intervertebral disc, and indicated Plaintiff would require L5-S1 hemilaminotomy and discectomy for excision of the large disc herniation. *Id.*

On January 15, 2014, Plaintiff underwent right L5 hemilaminotomy and excision of L5-S1 herniated nucleus pulposus. Tr. at 17–18.

C.    The Administrative Proceedings

1.    The Administrative Hearing

At the hearing on June 12, 2013, Plaintiff testified she last worked in August 2011, after falling over her son's toy and injuring her left knee. Tr. at 55–56. She stated she subsequently worked for a week-and-a-half at a daycare center in March 2012, but was unable to complete her job duties over the course of an eight-hour day. Tr. at 56.

Plaintiff testified that she underwent knee surgery in December 2011. Tr. at 57. She indicated Dr. Ward initially referred her to two orthopedists, who recommended physical therapy, and later referred her to Dr. Caldwell, who sent her for an MRI that revealed a torn meniscus. Tr. at 57–58. She testified that Dr. Caldwell subsequently performed surgery to repair her meniscus. *Id.*

Plaintiff testified she was on leave from her job from August 2011 through January 2012, but that her leave status and health insurance terminated following her knee surgery. Tr. at 60. She stated she had not had health insurance since that time and was paying Dr. Ward out-of-pocket. *Id.*

Plaintiff testified her knee pain improved following surgery, but she developed back pain after the surgery. *Id.* She described pain in her right hip and between her right shoulder and her neck. Tr. at 58–59. Plaintiff stated she attempted physical therapy to address her back pain, but it was unsuccessful. Tr. at 59. She indicated she also visited a chiropractor and an acupuncturist, who were unable to relieve her symptoms. *Id.*

Plaintiff testified she experienced muscle spasms on the left and right sides of her back that were not relieved by muscle relaxant medications. Tr. at 63. She indicated she took Oxycontin four times daily. Tr. at 60. She stated Dr. Ward had instructed her to lie down during the day to rest her knees, legs, and back. Tr. at 61. She indicated she needed to lie down each day for three to four hours. *Id.* She stated her symptoms were worse on some days than others and that she would lie down for seven to eight hours on her bad days. *Id.* She initially indicated she experienced two bad days per week, but later indicated she had 10 to 15 bad days per month. Tr. at 62. She stated she was unaware of

particular actions that triggered her muscle spasms. *Id.* She indicated she was unable to get up without assistance when she experienced muscle spasms. *Id.*

Plaintiff testified that the orthopedist had recommended surgery for her back. Tr. at 71. She indicated she would obtain surgery if she could afford to do so. *Id.* She also indicated Dr. Ward had recommended an MRI of her back, but that she had been unable to afford the MRI. Tr. at 72.

Plaintiff testified that she could sit for approximately 30 minutes at a time before her pain increased and she became uncomfortable. Tr. at 63–64. She indicated she could stand and walk for 45 minutes at a time. Tr. at 64. She testified she would be unable to perform a job with the option to alternate sitting and standing at will because her pain was unbearable. *Id.* She indicated she could walk 25 yards without stopping. Tr. at 64–65. She stated she was unable to lift and carry a gallon of milk, bend, stoop, or climb ladders without exacerbating her pain. Tr. at 65–66. She stated she lived in a two-story house and was able to climb her stairs, but that she typically went up and down the stairs only once a day. *Id.* She endorsed some forgetfulness and stated she was no longer able to read novels because she could not recall what she read earlier. Tr. at 67.

Plaintiff testified she lived with her husband, a 15-year-old daughter, and a five-year-old son. Tr. at 67. She indicated her husband performed the grocery shopping for her household, but that she occasionally picked up a few items from the store. Tr. at 65. She stated her husband and daughter performed most household cleaning, but that she folded the laundry. Tr. at 68, 73. She indicated her husband did some cooking, but that they often purchased food from restaurants. Tr. at 68. Plaintiff testified she was no longer able

to take baths because of difficulty getting in and out of the tub. *Id.* She stated she attended church once a month, but was no longer involved in church activities. Tr. at 69. She testified that, prior to her injury, she had attended church weekly and been involved in church activities. *Id.* Plainitff indicated she had attended her daughter's basketball games before her injury, but could no longer attend because she could not sit in the bleachers. Tr. at 70. She stated she had been unable to attend her son's field trips and school activities. Tr. at 70–71.

2.    The ALJ's Findings

In his decision dated July 18, 2013, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.
2.    The claimant has not engaged in substantial gainful activity since August 7, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: status post arthroscopic synovectomy of the left knee and back pain (20 CFR 404.1520(c) and 416.920(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except no climbing of ladders, ropes and scaffolds, occasional climbing of ramps and stairs, occasional balancing, stooping, kneeling, crouching, and crawling, and avoiding concentrated exposure to workplace hazards.
6.    The claimant is capable of performing past relevant work as a customer compliant clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

> 7.     The claimant has not been under a disability, as defined in the Social Security Act, from August 7, 2011, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. at 40–47.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

> 1)     the ALJ did not adequately consider the opinion of Plaintiff's treating physician;
>
> 2)     the Appeals Council failed to consider new and material evidence;
>
> 3)     the ALJ's reliance on the state agency consultants' opinions was not supported by substantial evidence; and
>
> 4)     the ALJ should have obtained VE testimony regarding the implications of Plaintiff's nonexertional limitations.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish her impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h) and 416.920(h).

(providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the

Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Treating Physician's Opinion

Plaintiff argues that the ALJ failed to follow the proper legal standard in disregarding the opinion of her treating physician. [ECF No. 19 at 4]. She maintains that the ALJ did not consider the consistency of Dr. Ward's opinion with the record as a whole. *Id.* at 7. Plaintiff also argues the ALJ misstated the evidence of record when he

22

found that Dr. Ward had not recommended any significant treatment for her back. *Id.* at 8.

The Commissioner argues the ALJ adequately supported his finding that Dr. Ward's opinion was entitled to little weight. [ECF No. 21 at 6]. She maintains the ALJ supported his decision by noting that the medical evidence showed a lack of significant clinical findings and treatment. *Id.* at 6–7. She contends the court should defer to the ALJ's weighing of the evidence. *Id.* at 8.

The adjudicator "must always carefully consider medical source opinions about any issue." SSR 96-5p. The Social Security Administration's ("SSA's") regulations direct that ALJs should accord controlling weight to treating physicians' opinions that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If an ALJ determines that a treating physician's opinion is not well-supported by medically-acceptable clinical or laboratory diagnostic techniques or is inconsistent with the other substantial evidence of record, the ALJ should proceed to weight all the opinions of record, including the treating physician's opinion, based on the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c). *Id.*; SSR 96-2p. Those factors include (1) the examining relationship between the claimant and the medical provider who rendered the opinion; (2) the treatment relationship between the claimant and the medical provider who rendered the opinion, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his or her own

treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. §§ 404.1527(c), 416.927(c).

The SSA's regulations also guide ALJs in weighing the factors. Even if the record does not support according controlling weight to a treating physician's opinion, the treating physician's opinion still generally carries more weight than any other opinion evidence in the record based on the examining and treatment relationship. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Nevertheless, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The regulations indicate that ALJs should give greater weight to opinions that are supported by medical signs and laboratory findings and adequately explained by the medical provider than to unsupported and unexplained opinions. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). "[T]he more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004).[6] Furthermore, ALJs should accord greater weight to opinions from specialists with respect to medical issues related to their particular areas of specialty than to physicians' opinions regarding impairments outside their areas of specialty. 20 C.F.R. § 404.1527(c)(5).

---

[6] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

Finally, ALJs should consider any additional evidence relevant to the particular case that tends to support or contradict medical opinions in the record. 20 C.F.R. § 404.1527(c)(6).

"[A]n express discussion of each factor is not required as long as the ALJ demonstrates that he applied the . . . factors and provides good reasons for his decision." *Hendrix v. Astrue*, C/A No. 1:09-1283-HFF, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010). This court should not disturb the ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

In explaining his decision to give little weight to Dr. Ward's opinion, the ALJ indicated it was "not supported by the claimant's course of treatment and was "not consistent with the other treatment records or record as a whole." Tr. at 45. He further stated that there was "no indication Dr. Ward recommended any significant treatment" for Plaintiff's back. *Id.*

The ALJ earlier noted that the medical evidence did not "substantiate the claimant's allegations as to the severity of her impairments and the functional limitations imposed therefrom." Tr. at 44. He acknowledged that Plaintiff "reported constant pain," but found that "the medical evidence fails to reveal that the claimant was ever in any acute distress and examinations were essentially benign." *Id.* The ALJ noted that left knee arthroscopic surgery was "generally successful" in relieving Plaintiff's left knee symptoms. *Id.* The ALJ indicated that x-rays of Plaintiff's spine "showed only mild

thoracic and cervical kyphosis and spondylosis with no evidence of herniation, stenosis, or nerve root impingement." *Id.* He found that there was "no indication that the claimant has required emergency treatment or inpatient hospitalization for these conditions and in spite of her allegations of disabling back and knee pain, the claimant has not sought additional treatment including treatment from a pain clinic." *Id.* He further noted that "[t]he evidence of record fails to reveal any signs of muscular atrophy, strength deficits, circulatory compromise, neurological deficits, muscle spasms, or change in weight, which may be reliable indicators of long-standing, severe or intense pain, physical inactivity, and/or depression." Tr. at 44–45.

The ALJ cited sufficient evidence to support a finding that Dr. Ward's opinion was not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or was inconsistent with the other substantial evidence in the case record. Thus, substantial evidence supported his decision not to accord controlling weight to Dr. Ward's opinion. However, an ALJ's duty to weigh the opinion of a treating physician does not end when he finds that the opinion is not entitled to controlling weight, and the ALJ must still evaluate the treating physician's opinion based on the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c). *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p ("Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.

Treating source medical opinions are still entitled to deference and must be weighed using all the factors provided in 20 CFR 404.1527 and 416.927.").

A review of the record suggests the ALJ did not properly evaluate Dr. Ward's opinion based on the factors and guidance set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c). The regulations directed the ALJ to give deference to Dr. Ward's opinion as it was the only opinion of an examining and treating physician of record. *See* 20 C.F.R. §§ 404.1527(c)(1), (2), 416.1527(c)(1), (2); SSR 96-2. Plaintiff maintained monthly follow up appointments and treated with Dr. Ward on 25 occasions from June 2011 to April 2013. Tr. at 315–87. However, the record does not reflect that the ALJ considered the length of the treatment relationship and the frequency of examination, which were relevant to the evaluation of Dr. Ward's opinion. *See* Tr. at 44 (citing Plaintiff's visits to "Ashley River Family Physicians" in March 2012, June 2012, January 2013, February 2013, March 2013, and April 2013); *see also* 20 C.F.R. § 404.1527(c)(2)(i), 416.927(c)(2)(ii) ("When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.").

In examining the supportability of Dr. Ward's opinion, the ALJ erroneously concluded that Dr. Ward had not "recommended any significant treatment for Plaintiff's back." *See* Tr. at 45. In fact, Dr. Ward prescribed pain medications, administered at least one Toradol injection, referred Plaintiff to several specialists, and recommended Plaintiff undergo an MRI and possible injections from a pain management physician. *See* Tr. at

27

328 (referred Plaintiff to chiropractor), 335 (referred Plaintiff to Southeastern Spine for orthopaedic surgery consultation), 354 (referred Plaintiff for MRI of lumbar spine), 364 (referred Plaintiff to Southeastern Spine), 371 (referred Plaintiff to Dr. Zgleszewski), 375 (indicated a need to obtain an MRI and to refer Plaintiff to a pain management physician for injections), 378 (administered a Toradol injection). According to Plaintiff's testimony and her attorney's opening statement, her ability to obtain the additional testing and treatment Dr. Ward recommended was limited by the fact that her health insurance coverage lapsed in January 2012 and that she had to pay out-of-pocket for treatment. *See* Tr. at 55, 60. While the ALJ could have properly concluded that Plaintiff did not undergo significant treatment for her back, his conclusion that Dr. Ward did not recommend significant treatment for Plaintiff's back is refuted by the record.

Furthermore, in concluding that Dr. Ward's findings were essentially benign and that records did not show Plaintiff to be in acute distress, the ALJ failed to note additional objective evidence that supported Dr. Ward's opinion, including observations of paravertebral muscle spasms and tenderness to palpation in Plaintiff's spine and sacroiliac joint during nearly every visit, indications that Plaintiff appeared to be in pain during examinations, and findings of decreased sensation to light touch in Plaintiff's right and left great toes. *See* Tr. at 326, 328, 330, 334, 336, 349–50, 351, 353, 361–62, 363, 366, 368, 370, 374, 377–78. The ALJ incorrectly indicated in the decision that there was no evidence of sensory deficits. *See* Tr. at 46.

In light of the foregoing, the undersigned recommends the court find the ALJ did not meet his burden to cite persuasive contradictory evidence to support his decision to

give little weight to Dr. Ward's opinion. *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) ("While the Secretary is not bound by the opinion of a claimant's treating physician, that opinion is entitled to great weight for it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time. Therefore, it may be disregarded only if there is persuasive contradictory evidence."), citing *Oppenheim v. Finch*, 495 F.2d 396 (4th Cir. 1974); *Vitek*, 438 F.2d at 1157. Although it is not the role of the court to reweigh the evidence, it is appropriate for the court to remand the case for the evidence to be reconsidered where the ALJ's decision does not reflect careful consideration of a claimant's treatment history and the medical evidence of record. Therefore, the undersigned recommends the court find the ALJ's decision to accord little weight to Dr. Ward's opinion to be unsupported by substantial evidence.

### 2.     New Evidence Submitted to the Appeals Council

Plaintiff argues the Appeals Council erred in failing to consider new evidence. [ECF No. 19 at 9]. She maintains that a September 2013 MRI report and medical records from Dr. Aymond dated October 1, 2013, through January 16, 2014, were new and material and related to Plaintiff's condition prior to the hearing. *Id.* She further contends that, had the ALJ considered the new evidence, he might have reached a different conclusion as to the severity of Plaintiff's condition and the weight to be accorded to Dr. Ward's opinion. *Id.* at 10.

The Commissioner argues that the evidence submitted to the Appeals Council referred to Plaintiff's functioning after the hearing and did not support Dr. Ward's opinion. [ECF No. 21 at 7].

"If 'dissatisfied' with an ALJ decision as to entitlement to disability benefits, a claimant 'may request' that the Appeals Council review 'that action.'" *Meyer v. Astrue,* 662 F.3d 700, 704 (4th Cir. 2011), citing 20 C.F.R. § 404.967. The SSA's regulations provide for the Appeals Council to grant review under the following conditions: if there is an apparent abuse of discretion by the ALJ; if there is an error of law; if the ALJ's action, findings, or conclusions were not supported by substantial evidence; or if the case concerns a broad policy or procedural issue that may affect the general public interest. 20 C.F.R. §§ 404.970(a), 416.1470.

A claimant may submit additional evidence that was not before the ALJ at the time of the hearing, along with the request for review. *Meyer,* 662 F.3d at 705. However, the evidence must be both "new" and "material," and the Appeals Council is directed to consider the additional evidence " only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. §§ 404.970(b), 416.1470(b). "Evidence is new 'if it is not duplicative or cumulative' and is material if there is 'a reasonable possibility that the new evidence would have changed the outcome.'" *Meyer,* 662 F.3d at 705, citing *Wilkins v. Sec'y, Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991). If the new and material evidence pertains to the period on or before the date of the ALJ's hearing decision, the Appeals Council should evaluate it as part of the entire record. 20 C.F.R. §§ 404.970(b), 416.1470(b).

After reviewing the entire record, including the new and material evidence, the Appeals Council will grant review and either issue its own decision or remand the claim to the ALJ, if it finds that the ALJ's "action, findings, or conclusion" was "contrary to the weight" of all evidence. *Meyer*, 662 F.3d at 705, citing 20 C.F.R. §§ 404.970(b), 416.1470(b). However, if after considering all the evidence, the Appeals Council decides that the ALJ's actions, findings, and conclusions were supported by the weight of the evidence, the Appeals Council will deny review and is not obligated to explain its rationale. *Id.* at 705–06.

The Appeals Council indicated it looked at records from Ashley River Family Physicians dated September 4, 2013, Orthopaedic Specialists of Charleston dated January 15, 2014, Mt. Pleasant Hospital dated January 15, 2014, and Roper St. Francis Hospital dated October 1, 2013. Tr. at 2. However, it determined the records pertained to a later period and did not affect the decision about whether Plaintiff was disabled on or before the date of the ALJ's decision. *Id.* Thus, the Appeals Council did not weigh the probative value of the evidence to determine whether the ALJ's decision was supported with its inclusion, but rather found that the evidence did not pertain to the period prior to the ALJ's decision and did not have to be considered as part of the record as a whole.

In *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340–41 (4th Cir. 2012), the Fourth Circuit indicated that evidence created after an ALJ's decision should be given retrospective consideration under certain circumstances. In *Bird*, the court explained that its decisions in *Moore v. Finch*, 418 F.2d 1224 (4th Cir. 1969) and *Johnson v. Barnhart*, 434 F.3d 650 (4th Cir. 2005) provided that "retrospective consideration of evidence" was

1:14-cv-04266-DCN    Date Filed 11/04/15    Entry Number 28    Page 32 of 39

"appropriate when 'the record is not so persuasive as to rule out any linkage' of the final condition of the claimant with his earlier symptoms." 699 F.3d at 341, citing *Moore*, 418 F.3d at 1226.

Applying the test set forth in *Bird* to the evidence at hand suggests that the Appeals Council erred in failing to consider its probative value. Although the medical treatment reflected in the records submitted to the Appeals Council occurred after the ALJ's decision, the evidence was not so persuasive as to rule out any linkage between Plaintiff's complaints prior to the ALJ's decision and the examination reports, MRI findings, and surgical records from September 2013 through January 2014. *Compare* Tr. at 16–23, *with* Tr. at 315–87. Plaintiff complained of pain in her low back at nearly every visit with Dr. Ward between November 2011 and April 2013. *See* Tr. at 328, 332, 334, 336, 349, 351, 353, 361, 363, 365, 368, 370, 372. Dr. Ward and other physicians referred Plaintiff for an MRI of her lumbar spine on several occasions, but Plaintiff was unable to obtain the MRI until September 2013 because she lacked insurance and private funding. *See* Tr. at 55, 60, 349, 351, 354, 368, 372, 380. While the Commissioner correctly asserts that the October 1, 2013, record differs from earlier records in that it indicates that Plaintiff walked with a slow and deliberate gait and had a positive straight-leg raising test, she incorrectly cites these observations to be those of Dr. Ward when they were actually those of the orthopedist, Dr. Aymond. *See* Tr. at 19–20. It is possible, as the Commissioner argues, that Plaintiff's condition and symptoms worsened after the ALJ's decision, but it is also possible that these findings were not included in earlier records because Plaintiff did not undergo a thorough orthopaedic examination of her back until

October 2013. In light of the foregoing, the undersigned finds that "the record is not so persuasive as to rule out any linkage" between Plaintiff's condition prior to the ALJ's decision and her condition from October 2013 through January 2014. The evidence could reasonably change the ALJ's assessment of the other evidence, including Dr. Ward's opinion. Therefore, the undersigned recommends the court find the Appeals Council's decision to exclude the additional evidence to be unsupported by substantial evidence and further recommends that the evidence be considered on remand, along with the other evidence of record.

### 3.    Reliance on State Agency Consultants' Opinions

Plaintiff argues the ALJ improperly relied upon the opinions of the non-examining state agency consultants. [ECF No. 19 at 11]. She maintains that the state agency consultants' opinions were rendered without review of the entire record. *Id.* Plaintiff contends the ALJ did not comply with the provisions of SSR 96-6p in giving greater weight to the opinions of the state agency consultants than to her treating physician. *Id.* at 11–12.

The Commissioner argues the ALJ was entitled to rely upon the state agency medical consultants' opinions to support his residual functional capacity assessment. [ECF No. 21 at 8]. She further argues that Plaintiff's symptoms did not increase in severity between the time that the state agency consultants rendered their opinions and the time of the ALJ's hearing. *Id.* at 9.

ALJs must consider findings and other opinions of state agency medical consultants as opinion evidence and must evaluate them based on the factors set forth in

20 C.F.R. §§ 404.1527(a)–(d) and 416.927(a)–(d). 20 C.F.R. §§ 404.1527(e)(2)(i), (ii), 416.927(e)(2)(i), (ii). ALJs are not bound by the findings of state agency consultants, "but they may not ignore these opinions and must explain the weight given to the opinions in their decisions." SSR 96-6p.

State agency consultants' opinions "can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence, including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion" offered by the consultants. *Id.* Under some circumstances, the state agency consultants' opinions may be entitled to greater weight than the opinions of a claimant's treating medical source. *Id.* For example, a state agency medical consultant's opinion may be entitled to greater weight than a treating physician's opinion if it "is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source." *Id.*

The ALJ "accorded great weight" to the opinions of the state agency medical consultants. Tr. at 45. He found most of the physical restrictions assessed by the consultants to be "consistent with the objective evidence of record." *Id.* However, he found the restrictions they assessed as to environmental irritants to be unsupported. *Id.*

The undersigned recommends the court find that substantial evidence did not support the ALJ's decision to give great weight to the state agency consultants' assessments of Plaintiff's RFC. The consultants' opinions were based upon an incomplete record that now includes MRI evidence of a herniated disc and records from Plaintiff's spinal surgery. In light of this additional evidence and because the ALJ did not adequately consider Dr. Ward's opinion, the undersigned recommends a finding that his reliance on the state agency's consultants' opinions was not supported by substantial evidence.

### 4.     Failure to Obtain VE Testimony

Plaintiff argues the ALJ erred in failing to obtain the testimony of a VE. [ECF No. 19 at 13]. She maintains that ALJs cannot determine whether non-exertional limitations significantly erode the occupational base without consulting a vocational expert. *Id.* She argues Dr. Ward's indication that she would likely be absent from work more than four days per month would have significantly eroded the occupational base and that the ALJ should have sought vocational testimony regarding this limitation. *Id.* at 13.

The Commissioner argues the ALJ correctly found Plaintiff could perform her PRW. [ECF No. 21 at 9–10].

If a claimant's RFC allows her to perform her PRW, she is not disabled within the meaning of the Social Security Act. 20 C.F.R. §§ 404.1520 (a)(4)(iv), 416.920(a)(4)(iv). The ALJ "may rely on the general job categories of the *Dictionary* as presumptively applicable to a claimant's prior work." *DeLoatche v. Heckler*, 715 F.2d 148, 151 (4th Cir. 1983).

35

The Commissioner's burden to prove that a claimant can perform other work that exists in significant numbers in the economy is only triggered after the claimant establishes that she cannot perform her PRW. *Sawyer v. Colvin*, 995 F.Supp.2d. 496, 507 (D.S.C. 2014). "When a claimant: (1) suffers from a nonexertional impairment that restricts his ability to perform work of which he is exertionally capable, or (2) suffers an exertional limitation which restricts him from performing the full range of activity covered by a work category, the ALJ may not rely on the Grids and must produce specific vocational evidence showing that the national economy offers employment opportunities to the claimant." *Landrum v. Astrue*, No. 08-2678-TLW-JRM, 2010 WL 558599, at *7 (D.S.C. Feb. 10, 2010), citing *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989); *Hammond v. Heckler*, 765 F.2d 424, 425–26 (4th Cir. 1985); *Cook v. Chater*, 901 F.Supp. 971 (D.Md. 1995). To meet the burden to produce specific vocational evidence showing that the national economy provides employment opportunities, it is often necessary for the ALJ to solicit the services of a VE. *See Walker*, 889 F.2d at 50.

The ALJ found that Plaintiff had the RFC to perform a reduced range of light work that included no climbing of ladders, ropes, or scaffolds; only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, or crawling; and no concentrated exposure to workplace hazards. Tr. at 42–43. Given these restrictions, the ALJ indicated he considered both Plaintiff's and the *DOT*'s descriptions of Plaintiff's PRW as a customer complaint clerk, and found Plaintiff to be capable of performing the job. Tr. at 46.

In light of the additional evidence presented to the Appeals Council and the ALJ's errors in reviewing Dr. Ward's opinion and the opinions of the state agency physicians, the ALJ's RFC assessment and his conclusion that Plaintiff could perform her PRW were flawed. If the ALJ's finding that Plaintiff could perform her PRW were supported by the record, the ALJ could have properly relied on Plaintiff's and the *DOT*'s descriptions of her PRW and would not have been required to obtain VE testimony. *See DeLoatche*, 715 F.2d at 151; *Sawyer*, 995 F.Supp.2d. at 507. However, because the ALJ's finding that Plaintiff could perform her PRW is not supported by substantial evidence, it may be necessary for the ALJ to reassess Plaintiff's RFC on remand and to determine if her RFC allows for performance of her PRW. Should the ALJ find that Plaintiff's newly-assessed RFC does not allow for performance of her PRW, he will likely need to solicit the services of a VE regarding the vocational implications of any assessed nonexertional limitations and/or an inability to perform a full range of work within a particular exertional category.

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of

42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

November 4, 2015                                    Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).